**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

Filed
Washington State
Court of Appeals
Division Two

November 28, 2023

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56832-2-II |
| Respondent, | |
| v. | |
| SAMUEL MATAMUA, | PUBLISHED OPINION |
| Appellant. | |

CRUSER, A.C.J. — Samuel Matamua was charged with first degree robbery following an attack at a park in Olympia, Washington. During jury selection, the court denied Matamua's attempted peremptory challenge following a GR 37 analysis. The juror was seated, and Matamua was convicted of first degree robbery. His judgment and sentence includes legal financial obligations (LFOs) in the form of the $500 crime victim penalty assessment (VPA), restitution in the amount of $158.50, and community custody supervision fees.

Matamua appeals, arguing that the trial court's GR 37 procedure injected racial bias into the proceedings and that the trial court erroneously concluded that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge. In addition, Matamua argues that the VPA and restitution violate the excessive fines clause and that the trial court committed a scrivener's error when it imposed the community supervision fees. The State concedes that the community custody supervision fees were imposed against Matamua in error.

No. 56832-2-II

We hold that the trial court erred in denying Matamua's peremptory challenge against juror 15, but that the error was harmless under the nonconstitutional harmless error standard. Accordingly, we affirm Matamua's conviction for first degree robbery. In addition, we remand for the trial court to consider whether the VPA should be stricken from Matamua's judgment and sentence based on recent statutory amendments. The restitution, however, does not violate the excessive fines clause. Based on the State's concession, we remand for the trial court to strike the community supervision fees from Matamua's judgment and sentence.

FACTS

I. BACKGROUND

In September 2021, Richard Johnson was at Heritage Park in Olympia. Johnson was doing a dance workout while dressed in a rainbow costume with custom fangs. They also wore a shoulder purse that held their driver's license, "a few dollars," and a CD player that was connected to headphones that they were wearing. 3 Verbatim Rep. of Proc. (VRP) at 294.

While Johnson was doing their dance workout, someone approached them, hit them on the side of the face with a rolled-up mat, and punched them. The attacker then tore Johnson's purse off of their neck and left. Another person at the park stopped to assist Johnson, and the two approached the attacker, who dropped the purse. Johnson's fangs, purse, and headphones were damaged as a result of the attack.

Johnson described their attacker as a "tall, [B]lack, bare-chested man carrying a rolled-up mat," and could not remember anything else about what the attacker looked like. *Id.* at 296. Two witnesses drove by as Johnson was attacked and called 911 to report the incident. One of these witnesses described the attacker as wearing shorts, no shirt, with "shaggy and brown hair," and the

No. 56832-2-II

other believed the attacker was Black and wearing tan shorts with no shirt. *Id.* at 273. Neither felt comfortable making an identification of the attacker.

Sergeant Matthew Renschler from the Olympia Police Department arrived on the scene within minutes. Dispatch described the attacker as a "shirtless [B]lack male." *Id.* at 441. When Sergeant Renschler arrived at the park, he initially spoke with Johnson but could see a "shirtless dark-skinned male wearing shorts" approximately one block away. *Id.* at 442. He did not see any other people leaving the scene that matched the description. Sergeant Renschler knew that other responding officers were close by, so he stayed with Johnson and advised the other officers that he saw a person matching the description and gave them the location. This description included that the suspect had two braids in his hair and was carrying a mat.

When the other officers arrived, they saw Matamua, who was shirtless and wearing tan shorts, was carrying a rolled-up mat, and had darker skin and braids in his hair. Matamua caught the officers' attention because this matched the description from dispatch and Sergeant Renschler. The officers did not notice others in the area matching the description. Matamua was arrested and charged with first degree robbery. When Matamua was in a patrol car with Washington State Trooper Joseph McClain, Matamua spontaneously stated, "I'm sorry." *Id.* at 414.

II. JURY SELECTION

At the outset of jury selection, the trial court explained to counsel,

> I do want counsel to just be taking notes throughout voir dire starting from the time that the jury panel arrives in the courtroom and continuing throughout voir dire regarding jurors to which General Rule 37 might apply. I will ask counsel that question as we proceed with voir dire to ensure that the court follows GR 37 and makes sure that we're taking adequate notes regarding those jurors. I know that this is an uncomfortable process. It is uncomfortable for the court as well, but I do want to make sure that we follow that rule, and if counsel throughout voir dire believes that it may need to exercise a peremptory as to a juror to which GR 37 applies, of

3

No. 56832-2-II

> course the court will look very carefully at the language of GR 37 with regard to that request. So [I] just want the parties to be aware to take good notes. All of our discussions regarding GR 37 may likely be without the jurors in the courtroom so that's why I say good notes are required.

2 VRP at 89-90 (italics omitted). During a break in voir dire, the court asked what the parties' "understanding is at this time of the jurors in our pool to which GR 37 applies." *Id.* at 201. The State expressed discomfort with the process and explained that "the point of GR 37 is to identify what the parties' implicit bias might be so I believe it truly is my perception that's at play, not whether or not – the reality of whether these folks fall within potentially GR 37." *Id.* at 202.

Based upon "learned stereotypes of people, skin color[,] and/or name," the State identified four jurors: jurors 12, 15, 24, and 33. *Id.* Defense counsel agreed with the State's list, and the court stated that GR 37 applied to those four jurors. The trial court then explained that it intended to ask the parties at the close of voir dire whether they intended to use a peremptory challenge on one of the four jurors to which GR 37 would apply, in which case the court would conduct a GR 37 analysis outside the presence of the panel. Neither party asked any questions or raised any objections regarding this process.

During voir dire, the State posed a hypothetical involving the weather. In the hypothetical, the jurors had heard that the forecast called for a rainstorm, had been in the courtroom with the windows closed, and watched someone come into the courtroom with a dripping wet umbrella and raincoat. Based on these facts, the State asked the jurors whether they would be convinced beyond

4

No. 56832-2-II

a reasonable doubt that it was raining outside. Juror 15 responded, "based on his actions I would have to assume that it was raining." *Id.* at 172.[1]

After the above-mentioned break in voir dire, defense counsel's first question was to juror 15. Counsel explained that in the weather hypothetical, the evidence was the juror's own observations, and then asked juror 15 what he expected to see in terms of the evidence in this case. Juror 15 responded, "presentation of the evidence against [Matamua], the defense's case on putting doubt possibly in the jury's decision based on, you know, questioning of the – of the witnesses." *Id.* at 206. Defense counsel explained that he was concerned about people's expectations for trial based on what they see on television shows or the news, and said to juror 15, "You had mentioned a defense case. Do you think there has to be a defense case?" *Id.* at 206-07. The following exchange occurred:

> JUROR 15: I believe so. There has to be a defense because there's – the prosecution is going to bring up the case against him of what supposedly he did.
>
> MR. SMITH: Do I have to call witnesses?
>
> JUROR 15: My assumption would be yes.
>
> MR. SMITH: What if you were instructed the answer is no, that I don't have to do anything?
>
> JUROR 15: I believe that would be your – that would be part of your strategy.

---

[1] Two other jurors that defense counsel ultimately used a peremptory challenge against engaged in questions about this hypothetical. Juror 8 responded that they would be convinced beyond a reasonable doubt that it was raining based off of the two pieces of information provided. Defense counsel later asked whether they would still be convinced if the stakes were that the person would be executed, and juror 8 maintained that they would be convinced it was raining. Juror 14 asked the State if they were "allowed to ask the person if it's raining outside." 2 VRP at 177. Defense counsel later mentioned this response from juror 14 and stated, "the answer's still no. Okay? No. You get what you've got." *Id.* at 185.

No. 56832-2-II

> MR. SMITH: Okay. But what I'm asking is if you're instructed that I don't have to do anything, that it is the [S]tate's burden entirely to prove this case and I don't have to call anyone or do anything, is that going to affect your expectations about what you think should be happening?
>
> JUROR 15: Possibly.
>
> MR. SMITH: Talk to me about that.
>
> JUROR 15: It depends on how you go about presenting your – your piece, your – what you're trying to instill doubt on the jury.
>
> MR. SMITH: Does Mr. Matamua have to testify?
>
> JUROR 15: That's strictly up to you as a defense.
>
> MR. SMITH: But if he doesn't, is that going to affect how you think the case should go?
>
> JUROR 15: No.

*Id.* at 207.

Defense counsel then asked juror 9 what they thought the case should look like, and juror 9 responded, "the evidence by both attorneys along with statements from witnesses presented by each side." *Id.* at 208. Defense counsel stated that juror 9 was "raising some of the things I talked about with juror 15," and asked whether the defense needed to have a case. *Id.* Juror 9 responded no. Defense counsel also asked whether juror 9 understood that the State has the burden to prove the case, and juror 9 responded yes.[2] Counsel then asked juror 12 whether they also understood that the State needed to prove the case, to which juror 12 responded yes, and counsel asked juror 7 whether they would hold it against Matamua if the trial did not play out the way that they may

---

[2] Defense counsel used a peremptory challenge to strike juror 9 from the panel.

No. 56832-2-II

have seen on television. Juror 7 responded no because they understood that this case was not for

entertainment purposes.

At the close of voir dire, the trial court asked the parties if they were "prepared to indicate

to the court whether or not they wish to use a peremptory challenge on one of the jurors we've

identified as those to which GR 37 applies." *Id.* at 221. Defense counsel indicated that he wished

to use a peremptory challenge for juror 15.[3] The court then asked counsel to explain the reasons

for the use of the peremptory challenge.[4] Counsel stated,

> when asked about the [S]tate's hypothetical and then when asked my hypothetical
> about what he was – my questions regarding what he expected to see, he gave me
> answers that indicated to me that he had been expecting the defendant to testify and
> thought that that was going to be an expectation. Juror number 15, nine, eight and
> 14 also I believe when the state gave their hypotheticals would be in a similar
> situation, and that's the reason why I'm striking juror number 15, but it will also be
> the reasons why I'm intending to strike eight, nine and 14. So for those reason – for
> that reason stated I am striking – or asking to strike a peremptory on juror number
> 15.

*Id.* at 229. In response, the State agreed that juror 15 seemed to expect Matamua to testify at first,

but that he eventually understood that this was not required, so it did not believe "that the record

is sufficient enough to say that he would be biased if the defendant did not testify." *Id.* at 230.

Defense counsel then expressed concern that even though juror 15 said he would not be biased if

Matamua did not testify, he may think differently during the pressure of deliberation, and counsel

did not want to take the risk because he did not intend for Matamua to testify.

---

[3] Defense counsel also sought to use a peremptory challenge for juror 12, but the denial of that challenge is not at issue in this appeal.

[4] The trial court essentially declared at the outset of the trial that it would be raising its own blanket objection under GR 37(c) to any strike of a juror to which it deemed GR 37 "applied." The rule seems to contemplate, however, that objections be raised in response to a specific peremptory challenge, rather than a blanket process.

7

No. 56832-2-II

The trial court denied the peremptory challenge against juror 15. The court explained that it must "determine whether an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." *Id.* at 231. The court repeated defense counsel's justification—that juror 15 seemed to expect Matamua to testify—and stated that, in its view, "it is not unusual for jurors to state their expectations perhaps inconsistent with how it might go. In follow[-]up questions, however, it is common for jurors to indicate that they would follow the law and they would base their decision on the evidence." *Id.* at 231-32. The court continued,

> I don't have a recollection, nor do I have notes of any follow[-]up questions and answers regarding juror number 15's statement of his expectations, . . .
>
> The court is not making any determination at this time that Mr. Smith or his client are intending to exercise a peremptory challenge based on race. However, the standard under GR 37 is very, very high, and this record does not have additional follow[-]up information to indicate that juror number 15 would not follow the law or that he would rule or find against the defendant if the defendant did not testify. There was simply a statement about expectations, and often jurors come in with expectations that – that may not be met or that may not be accurate in terms of what's going to happen in the trial.
>
> Because juror number 15 was determined to be a juror to which GR 37 applies and that that was not even a question by counsel and so the parties essentially have known throughout voir dire that GR 37 applies to juror number 15, there is this heightened standard if a peremptory would be used, and based upon the questions and answers, the statement by juror number 15 that there was an expectation that the defendant would testify is inadequate. The court is determining that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, and therefore, the court is denying the use of a peremptory challenge on juror number 15.

*Id.* at 232-33. Juror 15 was seated on the jury.

8

No. 56832-2-II

### III. TRIAL AND APPEAL

At trial, Johnson, eyewitnesses, and various law enforcement officers testified to the above facts. The jury was also shown a surveillance video of the attack. Matamua neither testified nor called any other witnesses. Matamua's defense was identity.

The jury found Matamua guilty of first degree robbery. The LFOs included in the judgment and sentence included the $500 VPA and $158.50 in restitution to Johnson. Defense counsel agreed to the restitution amount. The court signed an order of indigency. Matamua appeals.

### DISCUSSION

### I. GR 37

Matamua argues that the trial court's procedure created a racially biased jury selection process by preemptively excluding all white jurors from GR 37's reach and that the trial court erred by concluding that an objective observer could view race as a factor in Matamua's challenge regarding juror 15. The State argues that the trial court properly applied GR 37, and that if any error occurred, the error was harmless. We hold that although it was error to conclude that an objective observer could have viewed race or ethnicity as a factor in the use of Matamua's peremptory challenge for juror 15, the error does not require reversal under the nonconstitutional harmless error standard.

### A. LEGAL PRINCIPLES

The purpose of GR 37 is to "eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). Under the rule, either party or the trial court "may object to the use of a peremptory challenge to raise the issue of improper bias." GR 37(c). The objection is made by citation to GR 37, and any further discussion is conducted outside the presence of the venire. GR

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56832-2-II

37(c). Upon objection, the party that exercised the peremptory challenge at issue must articulate the reasons for which the peremptory challenge was used. GR 37(d).

The trial court must then evaluate the reasons for the challenge in light of the totality of the circumstances. GR 37(e). The rule provides a nonexclusive list of circumstances that the trial court "should consider" in its evaluation, such as

> (i) the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it;

> (ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;

> (iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party;

> (iv) whether a reason might be disproportionately associated with a race or ethnicity; and

> (v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

GR 37(g). If, after its evaluation, the trial court "determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied." GR 37(e). This does not necessitate a determination that the party was engaged in purposeful discrimination. GR 37(e).

In this case, no findings of fact were made by the trial court as part of its GR 37 analysis, nor were any credibility determinations made. Thus, our supreme court has determined that in a case such as this, the standard of review is de novo. *State v. Tesfasilasye*, 200 Wn.2d 345, 355-56, 518 P.3d 193 (2022). Pursuant to our de novo review, "the appellate court 'stand[s] in the same

10

No. 56832-2-II

position as does the trial court' in determining whether an objective observer could conclude that race was a factor in the peremptory strike." *Id.* (alteration in original) (quoting *State v. Jefferson*, 192 Wn.2d 225, 250, 429 P.3d 467 (2018) (plurality opinion)).

B. ANALYSIS

*1. Trial Court's Procedure for Objecting Under GR 37*

Matamua first points out that the rule does not limit its application to specific racial or ethnic groups and asks that we "take this opportunity to make clear to trial courts that GR 37 applies to all jurors, of all races and ethnicities." Br. of Appellant at 25. He argues that, because GR 37's language does not exclude white jurors from its reach, the trial court's exclusion of white jurors from those to whom GR 37 applied "injected racial discrimination into the jury selection process." *Id.* at 34.

The State agrees that GR 37 applies to all jurors by its plain language, but notes that neither party objected to the trial court's process. Indeed, the State contends that Matamua effectively endorsed this procedure by participating in the formation of the list of jurors to whom the parties believed GR 37 applied—a list which contained no white jurors.

We may decline to review claims of error that the defendant did not raise in the trial court unless the claimed error is "manifest error affecting a constitutional right." RAP 2.5(a)(3). This exception "does not permit *all* asserted constitutional claims to be raised for the first time on appeal." *State v. Kirkman*, 159 Wn.2d 918, 934, 155 P.3d 125 (2007). Rather, "[w]e look to the asserted claim and assess whether, if correct, it implicates a constitutional interest as compared to another form of trial error." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). After determining whether the alleged error is of constitutional magnitude, we look to whether the error

11

No. 56832-2-II

is manifest. *Id.* at 99. Error is manifest under RAP 2.5(a) if the appellant can show actual prejudice, demonstrated by a " 'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.' " *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Kirkman*, 159 Wn.2d at 935).

In Matamua's reply brief, he argues that the trial court's process violated equal protection by excluding white jurors from the scope of GR 37, and he appears to argue that this error was manifest because the parties were unable to object under GR 37 to the use of a peremptory challenge against white jurors. Matamua's concerns are well taken. We are troubled by the trial court's use of the term "jurors to which GR 37 *applies*" as an apparent euphemism for jurors of color. But Matamua does not argue that he would have objected under GR 37 to the State's use of a peremptory challenge against any white juror if not for the procedure implemented by the trial court. Matamua's argument, therefore, asks us to engage in speculation about the trial court's thought process when the record was not developed for us to opine on the issue of whether the trial court would have entertained such an objection. At issue in this appeal is whether the trial court improperly denied Matamua's peremptory challenge for juror 15, who was one of the jurors to whom the parties agreed GR 37 applied. Matamua has not shown that the alleged error in the trial court's voir dire procedure had practical and identifiable consequences in this case where he is not challenging any ruling following a GR 37 objection for a white juror. Accordingly, Matamua has not preserved this issue for appeal.

*2. Whether an Objective Observer Could View Race as a Factor in Matamua's Challenge*

Matamua next argues that the trial court erred by concluding that an objective observer could view race as a factor in Matamua's attempted peremptory challenge for juror 15. The State

No. 56832-2-II

argues that the trial court properly applied GR 37, though it does not point to portions of the trial court's GR 37 analysis that reviewed the nonexclusive list of considerations that the court should consider under the rule. These considerations are set forth above.

The trial court did not engage in any inquiry regarding these considerations. Although the court correctly articulated that it was required to determine whether an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, the court's analysis did not juxtapose defense counsel's questions or juror 15's responses with those of any other juror, as contemplated by the considerations in GR 37(g). The court did not discuss the number of questions posed to juror 15 and, in fact, stated that it did not have a recollection of any follow-up questions regarding juror 15's expectations that the defendant would testify. The court simply concluded that the justification for the peremptory challenge was "inadequate," and, therefore, an objective observer could view race or ethnicity as a factor in the use of the challenge against juror 15. 2 VRP at 233.

Because the record is devoid of information that would allow us to examine considerations (iv) and (v)—likely because here, the trial court *denied* the peremptory strike rather than granted it—we focus on considerations (i), (ii), and (iii). *State v. Booth*, 22 Wn. App. 2d 565, 577, 510 P.3d 1025 (2022). Regarding consideration (i), the record shows that defense counsel asked many follow-up questions regarding juror 15's expectations of the evidence, including whether he expected Matamua to testify. This was the concern expressed by defense counsel when seeking to use the peremptory challenge and, as the State points out, defense counsel appeared to use this questioning of juror 15 to illustrate the burden of proof to the jury panel. This factor appears to weigh in favor of Matamua.

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56832-2-II

Regarding consideration (ii), defense counsel immediately asked juror 9 a similar question about their expectations of the evidence and asked two follow-up questions. Although counsel did not pose as many follow-up questions to juror 9, the questions were similar and one question explicitly referenced juror 15's responses to express counsel's concern about juror 9's response and reiterate the burden of proof. And, with respect to consideration (iii), Matamua used a peremptory challenge against juror 9. These considerations weigh in favor of Matamua.

Based on our review of these considerations, the court erroneously denied Matamua's peremptory challenge for juror 15. It is worth noting that the court's apparent misunderstanding of GR 37 led the court to this error. Namely, believing that jurors of color were the only "jurors to which GR 37 *applies*" prompted the court's blanket disallowance of the removal of any juror of color absent a showing of good cause. And as Matamua correctly observes, "the court denied the strike because the defense could not show [j]uror 15 was biased, converting Mr. Matamua's peremptory strike into a [challenge] for cause." Br. of Appellant at 37. Indeed, the trial judge appeared to believe that Matamua's stated reason for the strike was inadequate because the trial court did not agree that juror 15 would disregard the court's instructions regarding the burden of proof. Thus, the trial court reasoned that Matamua's attempted strike necessarily ran afoul of GR 37. But this is incorrect. A party could have a reason for seeking to strike a juror that falls short of the grounds for *removal for cause* but nevertheless would not be viewed by an objective observer as having been motivated by racial or ethnic bias. And as the supreme court has stated, "[i]f a juror can be excused for cause, they should be excused for cause. Biased jurors simply should not be seated. But GR 37 is qualitatively different and is aimed at curing a different problem. It is not an alternate way to dismiss jurors for cause." *Tesfasilasye*, 200 Wn.2d at 359.

14

No. 56832-2-II

Having concluded the trial court erred in denying the peremptory strike of juror 15, we must address the remedy. When a trial court erroneously allows a peremptory challenge over a GR 37 objection, the remedy is a new trial. *See State v. Listoe*, 15 Wn. App. 2d 308, 329, 475 P.3d 534 (2020); *Booth*, 22 Wn. App. 2d at 580-81. However, the circumstances are different where the trial court erroneously denies a peremptory challenge under GR 37, empaneling the juror that the defendant sought to strike from the panel. *Booth*, 22 Wn. App. 2d at 580-81. Because "there is no right to a peremptory challenge under either the United States Constitution or the Washington Constitution, [ ] the erroneous loss of a peremptory challenge does not undermine the fundamental judicial process," and, therefore, does not constitute per se reversible error. *Id.* at 581-82 (footnotes omitted).

Rather, because the erroneous denial of a peremptory strike alone "does not present a constitutional issue, we analyze the error using the nonconstitutional harmless error standard. Under this standard, an 'error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.' " *Id.* at 584 (footnote omitted) (internal quotation marks omitted) (quoting *State v. Aljaffar*, 198 Wn. App. 75, 86, 392 P.3d 1070 (2017)). In *Booth*, the court held that the appellant failed to show prejudice because she did not argue that the subject juror could have been challenged for cause and because a law enforcement officer's testimony "provided overwhelming evidence of Booth's guilt." *Id.*

Matamua argues that, although juror 15's expectations regarding the evidence did not constitute a "disqualifying bias," the expectation could still have affected the outcome of the trial. Br. of Appellant at 58. This speculation is not enough to show that juror 15's absence on the jury would have changed the outcome. *See Booth*, 22 Wn. App. 2d at 584-85. In addition, Matamua

15

No. 56832-2-II

attempts to distinguish his case from *Booth* on the basis that the evidence against him was not overwhelming. Matamua points to the fact that both of the eyewitnesses and Johnson never identified him as the attacker. But law enforcement arrived on the scene within minutes of the attack and saw no others in the area matching the description of the attacker. Additionally, Matamua was in possession of a rolled-up mat, which is what the robber used to attack Johnson.

Matamua also points out inconsistencies between the 911 callers' description of the attacker and how Matamua actually looks. The callers were in the car driving by at the time of the attack and still provided a unique enough description to law enforcement that no one else in the area matched. It is also worth noting that the jury reviewed surveillance video of the attack and was convinced beyond a reasonable doubt that Matamua was the attacker.

Given this evidence, Matamua has not shown a reasonable probability that juror 15's absence on the panel would have changed the outcome. Accordingly, any error in the trial court's decision to deny Matamua's peremptory challenge following its GR 37 analysis was harmless.

## II. EXCESSIVE FINES

Matamua argues that the trial court's imposition of $158.50 in restitution, along with the $500 VPA, without inquiring into Matamua's ability to pay violated the excessive fines clause of the state and federal constitutions. We disagree with regard to restitution, but remand for the trial court to consider whether to strike the VPA from Matamua's judgment and sentence based on a newly enacted statutory provision.

### A. LEGAL PRINCIPLES

Both the Eighth Amendment to the United States Constitution and article I, section 14 of the Washington Constitution prohibit "excessive fines." There is a two-step inquiry to determine

16

No. 56832-2-II

whether a monetary sanction violates the excessive fines clause: (1) whether the sanction is punishment, and (2) whether the sanction is constitutionally excessive. *City of Seattle v. Long*, 198 Wn.2d 136, 163, 493 P.3d 94 (2021).

"A sanction is punishment under the excessive fines clause if it is at least 'partially punitive.' " *State v. Ellis*, 27 Wn. App. 2d 1, 10, 530 P.3d 1048 (2023) (quoting *Long*, 198 Wn.2d at 163). A sanction is constitutionally excessive "if it is grossly disproportional to the gravity of a defendant's offense." *Long*, 198 Wn.2d at 166. "To determine whether a sanction is disproportional, we consider (1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the violation, and (4) the extent of the harm caused." *Ellis*, 27 Wn. App. 2d at 10. The supreme court recently clarified that reviewing courts should also consider the defendant's ability to pay the sanction. *Long*, 198 Wn.2d at 173.

B. ANALYSIS

*1. VPA*

Matamua argues that the VPA is an excessive fine because the plain language of the VPA statute indicates that it is intended as a penalty, and because he cannot pay it. As we noted in *Ellis*, "this issue has been resolved by enactment of a new statutory provision regarding the VPA." 27 Wn. App. 2d at 16.

A recent amendment to RCW 7.68.035 provides that the VPA shall not be imposed against a defendant if the court finds they are indigent at the time of sentencing. LAWS OF 2023, ch. 449, § 1; RCW 7.68.035(4). The amended statute also requires trial courts to waive any VPA imposed prior to the amendment's effective date if the defendant is indigent and moves for such relief.

17

No. 56832-2-II

LAWS OF 2023, ch. 449, § 1; RCW 7.68.035(5)(b). The amendment went into effect on July 1, 2023. LAWS OF 2023, ch. 449. Although the amendment was not in effect at the time of his sentencing, it applies to Matamua because this case is on direct appeal. *See Ellis*, 27 Wn. App. 2d at 16.

Here, the trial court found Matamua indigent for purposes of this appeal but did not explain the statutory basis for that finding. The record contains insufficient evidence for us to determine whether the court would have found him indigent based on the operative definition of indigency if it considered the question at that time. *See* RCW 7.68.035(5)(b), 10.01.160(3), and 10.101.010(3)(a)-(c). We therefore must remand[5] for the court to consider whether to waive Matamua's VPA pursuant to RCW 7.68.035(5)(b).

*2. Restitution*

Regarding restitution, Matamua simply states that "[t]here is no question that a restitution order is at least partially punitive," citing *State v. Kinneman*, 155 Wn.2d 272, 279-80, 119 P.3d 350 (2005). Br. of Appellant at 69. But in *Ellis*, we clarified that *Kinneman* did not address whether restitution was punitive in the context of an excessive fines challenge, and we concluded that "the proper inquiry is whether the restitution order in a particular case is punitive." 27 Wn. App. 2d at 13 (emphasis omitted). We held that the restitution at issue in *Ellis* was not punitive because it was

---

[5] Rather than remanding to strike the fee, the statutes require us to remand for consideration of the issue. The operative VPA statute, RCW 7.68.035(5)(b), incorporates the definition of indigent contained in RCW 10.01.160(3). Subsection (a) of that definition, in turn, refers to the indigency criteria contained in RCW 10.101.010(3)(a)-(c), but excludes RCW 10.101.010(3)(d) ("Unable to pay the anticipated cost of counsel for the matter before the court because his or her available funds are insufficient to pay any amount for the retention of counsel.").

Although the record shows that Matamua was indigent for the purpose of appointing counsel, it does not indicate whether he is entitled to waiver of his VPA.

18

No. 56832-2-II

solely compensatory. *Id.* Similarly, here, the amount of restitution ordered was solely compensatory. The court ordered the amount requested by Johnson, $158.50, and Matamua agreed to the amount.

Furthermore, the amount of restitution ordered was not excessive. Even if a defendant is unable to pay, restitution orders that are based on the victim's actual losses are not excessive. *Id.* When the restitution award is based on the victim's actual losses, it is " 'linked to the culpability of the defendant and the extent of harm the defendant caused.' " *Id.* (quoting *State v. Ramos*, 24 Wn. App. 2d 204, 520 P.3d 65 (2022), *review denied*, 200 Wn.2d 1033 (2023)). Accordingly, we hold that the $158.50 in restitution ordered was not an excessive fine.

### III. COMMUNITY CUSTODY SUPERVISION FEES

Matamua argues that the trial court committed a scrivener's error when it failed to strike the community custody supervision fee from the judgment and sentence because the court intended to impose only mandatory fees. The State concedes that the supervision fee should be stricken. We accept the State's concession. Accordingly, we remand for the trial court to strike this fee.

### CONCLUSION

We hold that the trial court erred in denying Matamua's peremptory challenge against juror 15, but that the error was harmless under the nonconstitutional harmless error standard. Accordingly, we affirm Matamua's conviction for first degree robbery. Although the restitution is not an excessive fine, we remand for the trial court to determine whether to strike the VPA from Matamua's judgment and sentence based on the statutory amendments. Based on the State's concession, we also remand for the trial court to strike the community supervision fees from Matamua's judgment and sentence.

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56832-2-II

CRUSER, A.C.J.

We concur:

MAXA, J.

CHE, J.