# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

STATE OF WASHINGTON,

        Respondent,

    v.

BRANDON WILLIAM HARM,

        Appellant.

No. 58001-2-II

UNPUBLISHED OPINION

PRICE, J. — Brandon W. Harm appeals his conviction for one count of second degree assault committed against his girlfriend A.J. Harm argues that the trial court erred when it denied his motion to admit A.J.'s medical record and that there was insufficient evidence to support aspects of his conviction. Harm also argues that the trial court erred by imposing the $500 victim penalty assessment (VPA). In addition, Harm brings multiple claims in a statement of additional grounds (SAG).

We affirm Harm's conviction but remand for the trial court to strike the VPA.

## FACTS

### I. BACKGROUND AND INVESTIGATION

In October 2019, Harm and A.J. met through an online dating site. Shortly thereafter, Harm showed up at A.J.'s workplace. After spending time together during A.J.'s lunchbreak, the two exchanged cell phone numbers and parted ways.

Several days later, Harm and A.J. met again, this time at Harm's house. Harm introduced A.J. to his mother and showed A.J. his bedroom. When A.J. decided to leave, Harm walked her out to her car. The two began hugging and kissing. But as A.J. got into her car, Harm started strangling her. After ending the assault and before walking away from her car, Harm said, according to A.J., that he "hadn't had sex in a long time" and that "he makes the rules." Verbatim Rep. of Proc. (VRP) at 176.

Shortly after the incident, A.J. drove to her ex-boyfriend, Samuel Morgan, and told him about the assault. Morgan observed that A.J. was crying and her body was shaking.

The following day, A.J. went to the emergency room at the local hospital. A.J. appeared scared as she explained to a triage nurse that she had been strangled by a "boyfriend." VRP at 243. The triage nurse also observed swelling on A.J.'s neck. A.J. was next seen by the treating nurse, Shanta Gervickas. Nurse Gervickas observed that A.J. was crying as A.J. said that "her boyfriend" had strangled her. VRP at 272.

A law enforcement officer responded to the hospital to investigate. A.J. was crying as she recounted the incident to the officer, and he observed a small red dot on A.J.'s neck and bruising behind one of her ears. The officer recognized the bruising behind A.J.'s ear as being consistent with strangulation.

After the investigation, the State charged Harm with second degree assault. The State also alleged that the second degree assault was both sexually motivated and a domestic violence crime committed by an intimate partner.

II.  TRIAL

The case proceeded to a jury trial.  In pretrial motions in limine, Harm sought permission to introduce testimony from the ex-boyfriend Morgan that A.J. told Morgan she was going to buy some cocaine on the day of the incident.  The trial court denied the motion because it determined that there was no showing that A.J. actually got or used cocaine.

After opening statements, but before the beginning of testimony, Harm moved to admit a portion of A.J.'s medical record from her emergency room visit under the business records hearsay exception.  Harm believed the medical record contained information that appeared to contradict the observations from witnesses who said they saw physical injuries on A.J.  The medical record appeared to show that A.J. had no physical signs of injury; it stated:

> This is a 21 year old who presents with neck pain after she reports her boyfriend tried to strangle her yesterday. . . .  Without loss of consciousness, or any objective findings on exam including no bruising, petechiae, swelling, hoarseness, or focal neurologic findings, or any unilateral symptoms, no imaging was performed.  Carotid artery dissection appears unlikely.  Airway injury appears unlikely.  No evidence of head injury or c-spine injury.

Clerk's Papers (CP) at 47.

The trial court reserved ruling on the admissibility of the medical record.  The trial court expressed hesitancy because the record appeared to be written by a physician's assistant who was unavailable to testify and who expressly represented that she was not directly involved in A.J.'s care.

The State then called A.J. as its first witness.  A.J. explained that she left Harm's residence on the day of the incident because of what she saw in his bedroom.  She testified that Harm's bed had hooks on each of his bedposts which Harm had explained were for bondage, dominance, submission, and masochism (BDSM) in the bedroom.  This made A.J. uncomfortable so she

decided to leave. She denied there was any discussion about having sex or further discussion about BDSM.

A.J.'s testimony then turned to the assault. A.J. said that as she arrived at her car, the two briefly hugged and kissed. As she got into her car, Harm suddenly reached in and started strangling her. A.J. explained that Harm dug his nails into her neck and pushed down on her collarbone while strangling her. She could not breathe. While Harm was strangling her, he was forcibly kissing her and "sticking his tongue down [her] throat." VRP at 172. A.J. further explained that Harm's hand was constantly on her throat but he would intermittently let go and then resume strangling her. While Harm was strangling and forcibly kissing her, A.J. described Harm as looking "excited," with "a really creepy smile," and he had an erection. VRP at 175. When Harm eventually stopped, A.J. testified that Harm

> told [her] that he hadn't had sex in a long time and that [she] knew why he was doing that. He told [her] that he makes the rules. And then, he told [her] that [she] was insane and that he wanted [them] to be like [Harley] Quinn and the Joker.

VRP at 176. When asked about the reference to the Joker and Harley Quinn, A.J. explained that Harm wanted them "to be psychotic for each other and do crazy stuff that people wouldn't normally do." VRP at 176. Traumatized and upset, A.J. drove away and met up with her ex-boyfriend Morgan.

Morgan was next to testify. He described how he and A.J. spent time together that day both before and after the assault. When A.J. went to visit Morgan after the incident, Morgan testified that A.J. was in an emotional state—crying and shaking. Morgan also described redness he observed on A.J.'s neck, which he said was affected by the fact that her body temperature was fluctuating.

4

At some point, Morgan sent Harm a Facebook message accusing him of assaulting A.J. Harm responded to Morgan with a Facebook message in which Harm claimed that his strangulation of A.J. was consensual and part of a developing BDSM relationship. Harm's Facebook message stated:

> Yeah, and I think choking someone out is not ok either, consent is everything and concrete, after what her and I talked about last night, it was made out to be ok for us to start developing a BDSM dynamic, [I] would NEVER do anything that would make someone uncomfortable. She said she trusts me, so I don[']t understand why this is an issue[.]

CP at 52. Harm's message was admitted into evidence.

Prior to Morgan's cross-examination, Harm requested to discuss an issue outside the presence of the jury. Because Morgan had testified that he observed redness on A.J.'s neck that may have been affected by temperature fluctuations, Harm contended that the State had opened the door to questions about potential use of cocaine. The trial court then asked what Morgan meant when he testified that A.J.'s body temperature was fluctuating on the day of the incident, and Morgan answered that later that day he and A.J. were under the influence of cocaine.

The trial court ruled that it was going to continue to exclude any testimony from Morgan about A.J.'s cocaine use because it was "entirely prejudicial." VRP at 229. The trial court also ruled that Harm was permitted to ask about the initial redness on A.J.'s neck but anything potentially related to the use of cocaine was irrelevant.

After Morgan's testimony, the triage nurse testified that visible injuries are not always present in strangulation cases.

The State next intended to call Nurse Gervickas, the treating nurse who saw A.J. in the emergency room. At this point, outside the presence of the jury, Harm renewed his request to

5

admit the medical record under the business records hearsay exception, asserting that the exhibit would be admissible through the testimony of Nurse Gervickas. The trial court denied Harm's request, reasoning that Nurse Gervickas was not a records custodian.

Nurse Gervickas then took the witness stand and testified consistently with the facts set forth above. Nurse Gervickas also noted that visible injuries are not always present in strangulation cases.

The State's case in chief concluded with the testimony of the law enforcement officer who testified consistently with the facts set forth above. The State then rested.

The defense began its case by calling Dr. Jennifer Stankus, an emergency room physician, as an expert witness. The doctor testified that she had reviewed all of the available information about the incident, including the medical record that the trial court had previously excluded. From her review, Dr. Stankus testified in response to multiple questions that she saw no evidence of physical injuries from photographs and that the treating medical professionals did not find any physical injuries that were consistent with A.J.'s statements about what Harm did to her. Dr. Stankus opined that the medical professionals did not order a CT (computerized tomography) scan because there were no physical observations that would indicate one was necessary.

Following Dr. Stankus's testimony, Harm testified in his own defense. He claimed that during his meeting with A.J. at her workplace, the two held hands, hugged, and kissed. Harm also testified before meeting at his house, the two consistently texted each other.

According to Harm, before A.J. left in her car, the two kissed consensually and A.J. grabbed Harm's genital area. Harm admitted he had an erection but claimed it was from the

consensual kissing and A.J.'s touching. Harm also claimed that he and A.J. had discussed engaging in BDSM, but he denied strangling A.J.:

> [Defense counsel]: So, during that whole interaction, was there any choking or cutting off of the airway?

> [Harm]: No, there was not.

VRP at 366.

The case proceeded to closing arguments. Harm's theory involved denying that any strangulation occurred and that the State's case was manufactured. Harm did not argue, as a potential alternative theory, that a strangulation may have occurred, but that A.J. consented to it.

The jury found Harm guilty of second degree assault. The jury also found, via special verdict forms, that Harm committed the second degree assault with sexual motivation and that Harm and A.J. were family or household members.[1]

The trial court imposed a standard range sentence of 6 months with an additional 24 months for the sexual motivation sentencing enhancement.

Harm appeals.

## ANALYSIS

Harm makes three main arguments. First, Harm argues that the trial court erred in excluding the medical record, which he contends was admissible under the business records hearsay exception. Second, Harm argues that there was insufficient evidence to support the jury's

---

[1] The trial court instructed the jury that "[f]or purposes of this case, 'family or household members' means a person sixteen years of age or older with whom a person sixteen years of age or older has or has had a dating relationship." CP at 97. The trial court also instructed the jury that " '[d]ating relationship' means a social relationship of a romantic nature." CP at 97.

special verdicts that the assault was committed with sexual motivation and that he and A.J. were in a dating relationship. And third, Harm argues that the trial court erroneously imposed the VPA.

In his SAG, Harm claims that he received ineffective assistance of counsel and that the trial court erred in excluding evidence that A.J. was a cocaine user.

We address each argument in turn.

## I. TRIAL COURT'S EXCLUSION OF MEDICAL RECORD

Harm argues that the trial court erred in excluding the medical record because it was admissible under the business records hearsay exception. If the medical record was properly admitted, Harm asserts it would have materially affected the outcome of the trial because it showed that A.J. did not have any physical injuries consistent with an assault. The State argues that even if it was error to exclude the medical record, the error was harmless. We agree with the State.

We review the trial court's decision to admit or exclude evidence for an abuse of discretion. *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014). An abuse of discretion occurs when the decision was manifestly unreasonable or based on untenable grounds or reasons. *Id.*

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial, that is "offered in evidence to prove the truth of the matter asserted." ER 801(c). Unless an exception or exclusion applies, hearsay is inadmissible. ER 802.

One such hearsay exception is for business records. The business records hearsay exception provides:

> A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or *other qualified witness* testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

RCW 5.45.020 (emphasis added). Under this exception, it is unnecessary for the person who made the record to testify because testimony from the " 'custodian' " or " 'other qualified witness' " is sufficient. *State v. Quincy*, 122 Wn. App. 395, 399, 95 P.3d 353 (2004) (quoting *State v. Ben-Neth*, 34 Wn. App. 600, 603, 663 P.2d 156 (1983)), *review denied*, 153 Wn.2d 1028 (2005). The term " 'other qualified witness' " is interpreted broadly and includes one who has supervision of the record's creation. *Id.* (quoting *Ben-Neth*, 34 Wn. App. at 603).

The incorrect exclusion of evidence in violation of an evidentiary rule is generally analyzed under the nonconstitutional harmless error standard. *State v. Gower*, 179 Wn.2d 851, 854, 321 P.3d 1178 (2014). "Under the nonconstitutional standard, an error is harmless if there is no reasonable probability that the error materially affected the outcome of the trial." *State v. Hale*, 28 Wn. App. 2d 619, 639, 537 P.3d 707 (2023), *review denied*, 2 Wn.3d 1026 (2024).

If the excluded evidence is merely cumulative, any error is generally harmless. *See State v. Flores*, 164 Wn.2d 1, 19, 186 P.3d 1038 (2008) (" 'Washington has a long history of ruling error harmless if the evidence admitted or excluded was merely cumulative.' " (*quoting* Dennis J. Sweeney, *An Analysis of Harmless Error in Washington: A Principled Process*, 31 GONZ. L. REV. 277, 319 (1995))). The defendant has the burden to establish that a nonconstitutional error was not harmless. *State v. Barry*, 183 Wn.2d 297, 304, 352 P.3d 161 (2015).

Here, assuming, without deciding, that the trial court erred in excluding the medical record, any error was harmless. It is true that the medical record stated that A.J. did not show physical signs of an assault—no bruising, petechiae, swelling, or hoarseness. It is also true that the medical record stated that an airway injury was unlikely and that there was no evidence of a head injury.

But even without the medical record as an exhibit, the jury heard this evidence. Dr. Stankus told the jury the same information contained in the medical record. The doctor explained that from her review of the materials, including the medical record, the treating medical professionals examining A.J. did not find any physical injuries that were consistent with being strangled. Dr. Stankus also opined that the medical professionals did not order a CT scan because there were no physical signs that one would be necessary. Because the relevant information contained in the medical record was cumulative to the testimony of Dr. Stankus, Harm has not met his burden to show that any error by the trial court's decision to exclude the medical record was not harmless. *See Flores*, 164 Wn.2d at 19. Harm's argument fails.

## II. SUFFICIENCY OF THE EVIDENCE

Harm next argues that there was insufficient evidence to support the jury's special verdicts finding that Harm assaulted A.J. for the purpose of sexual gratification and that Harm and A.J. were in a dating relationship.[2] We disagree.

## A. STANDARD OF REVIEW

We review challenges to the sufficiency of the evidence de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). Evidence is sufficient to support a verdict if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could find that all of the elements of the crime charged were proven beyond a reasonable doubt. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). When a defendant challenges the sufficiency of the evidence, he admits the truth of the State's evidence, and all reasonable inferences drawn from

---

[2] Harm only challenges the sufficiency of the evidence for the jury's special verdict forms; he does not make a similar challenge to the underlying second degree assault conviction.

that evidence are to be construed in favor of the State. *Id.* at 265-66. And we defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of evidence. *State v. Ague-Masters*, 138 Wn. App. 86, 102, 156 P.3d 265 (2007).

B.  SEXUAL MOTIVATION

An allegation of sexual motivation requires the State to prove beyond a reasonable doubt that sexual gratification was among the defendant's purposes in committing the charged offense. *State v. Thompson*, 169 Wn. App. 436, 476, 290 P.3d 996 (2012), *review denied*, 176 Wn.2d 1023 (2013); former RCW 9.94A.030(49) (2019) (" 'Sexual motivation' means that one of the purposes for which the defendant committed the crime was for the purpose of his or her sexual gratification."). Specifically, the State must present " 'evidence of identifiable conduct by the defendant while committing the offense' " to support a finding of sexual motivation. *Thompson*, 169 Wn. App. at 476 (quoting *State v. Halstien*, 122 Wn.2d 109, 120, 857 P.2d 270 (1993)).

Here, A.J. testified that Harm had an erection while he was strangling and forcibly kissing her and that he looked "excited" the entire time. VRP at 175. According to A.J., Harm also explained that the assault occurred because "he hadn't had sex in a long time." VRP at 176. Viewing this evidence in a light most favorable to the State, the reasonable inference is that Harm received sexual gratification from the assault and, accordingly, the assault was sexually motivated. Thus, sufficient evidence supported the jury's finding of sexual motivation.

C. DATING RELATIONSHIP

The domestic violence act allows certain crimes to receive a domestic violence designation.[3] *State v. Abdi-Issa*, 199 Wn.2d 163, 169, 504 P.3d 223 (2022). A domestic violence designation allows the trial court to (among other things) impose specialized no-contact orders at sentencing. *Id.* The domestic violence act does not create new crimes, instead it merely highlights the need to enforce existing criminal statutes in ways that victims of domestic violence are protected. *Id.* at 169-170.

For the purposes of a domestic violence designation, "domestic violence" involves crimes, including second degree assault, committed by one "family or household member against another" or an "intimate partner." Former RCW 10.99.020(5) (2019); *see also* former RCW 9.94A.030(20). An "intimate partner" includes "persons sixteen years of age or older with whom a person sixteen years of age or older has or has had *a dating relationship*." Former RCW 26.50.010(7)(f) (2019) (emphasis added). A "dating relationship" in turn is "a social relationship of a romantic nature." Former RCW 26.50.010(2); *see also* former RCW 10.99.020(4) (2019) (" 'Dating relationship' has the same meaning as in RCW 26.50.010."). In determining whether a dating relationship exists, the court may consider several factors including: "(a) The length of time the relationship has existed; (b) the nature of the relationship; and (c) the frequency of interaction between the parties." Former RCW 26.50.010(2).

Here, A.J. and Harm met through an online dating site, showed affection on those two occasions where they met in person (including holding hands and kissing), and texted each other

---

[3] The legislature passed the domestic violence act to " 'assure the victim of domestic violence the maximum protection from abuse which the law and those who enforce the law can provide.' " *State v. Abdi-Issa*, 199 Wn.2d 163, 169, 504 P.3d 223 (2022) (quoting RCW 10.99.010).

constantly. Harm also introduced A.J. to his mother and showed A.J. his bedroom. And A.J. described Harm as her "boyfriend" to the medical professionals who treated her. VRP at 243, 272.

It is true that the duration of Harm and A.J.'s relationship was short and they only met in person on two occasions. But viewing all of the evidence in the light most favorable to the State, a rational trier of fact could nonetheless have found beyond a reasonable doubt that Harm and A.J. were in a dating relationship. Thus, Harm's argument that there was insufficient evidence for this jury special verdict form finding fails.

## III. VPA

Harm next argues that the VPA should be stricken because the VPA is no longer authorized by statute. The State has no objection to remanding for the trial court to strike the VPA. We agree the VPA should be stricken.

Effective July 1, 2023, the VPA is no longer authorized for indigent defendants. LAWS OF 2023, ch. 449 § 1; RCW 7.68.035(4). This change applies to Harm because the trial court found him indigent and his case is still on direct appeal. *State v. Matamua*, 28 Wn. App. 2d 859, 878-79, 539 P.3d 28 (2023), *review denied*, 2 Wn.3d 1033 (2024). Accordingly, we remand to the trial court to strike the VPA.

## IV. SAG CLAIMS

In his SAG, Harm claims that he received ineffective assistance of counsel. He appears to focus on three issues: (1) his counsel's failure to argue that A.J. consented to being strangled as an alternative theory in closing argument, (2) his counsel's failure to object to A.J.'s perjurious testimony that she and Harm did not discuss having sex, and (3) his counsel's failure to seek

admission of purported text messages that allegedly showed that Harm and A.J. discussed sex and BDSM.

Harm also claims that the trial court erred by excluding evidence of A.J.'s alleged cocaine use before and after the assault. We address each claim in turn.

A. INEFFECTIVE ASSISTANCE OF COUNSEL

To show ineffective assistance of counsel, the defendant must demonstrate (1) that their counsel's performance was deficient and (2) that the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 35, 296 P.3d 872 (2013). Failure to establish either prong is fatal to the claim. *Strickland*, 466 U.S. at 700.

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Vazquez*, 198 Wn.2d 239, 247-48, 494 P.3d 424 (2021). Generally, to show that trial counsel was deficient, "the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995). We strongly presume that counsel's performance was reasonable. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

First, Harm claims that he received ineffective assistance of counsel because his counsel failed to argue, as a defense theory, that the victim consented to the assault. Harm characterizes the assault as a "consensual activity previously discussed via text messages" and that "[t]he evidence" strongly corroborates that A.J. consented to the strangulation. SAG at 1.

In closing argument, Harm's counsel's theory of the case was that the assault did not happen; he made no alternative argument that A.J. may have consented to being strangled. This

strategy was entirely consistent with Harm's direct testimony during which he denied ever strangling A.J. VRP at 366 (Question: "So, during that whole interaction, was there any choking or cutting off of the airway?" Answer: "No, there was not."). In the face of this testimony, Harm fails to show the absence of legitimate strategic or tactical reasons supporting his counsel's decision to avoid an alternative theory that A.J. consented to the strangulation. Because Harm cannot demonstrate deficient performance, his ineffective assistance of counsel claim fails.

Second, Harm claims he received ineffective assistance because of counsel's failure to object to, or request a curative instruction, for A.J.'s "knowing use of perjured testimony." SAG at 2. This claim appears to be rooted in Harm's belief that A.J. perjured herself when she testified that she and Harm did not discuss having sex.

Harm testified that he and A.J. had previously discussed having sex involving BDSM. A.J.'s testimony was different—she denied they discussed sex or BDSM beyond Harm's explanation of the hooks on his bed. However, this difference in testimony alone does not demonstrate that A.J.'s testimony was false. It is not uncommon for the testimony of different witnesses to conflict. But when that occurs, we defer to the trier of fact on issues of conflicting testimony. *Ague-Masters*, 138 Wn. App. at 102. Harm cannot show that any objection, or request for a curative instruction, if made, would have been granted. *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541, *review denied*, 193 Wn.2d 1038 (2019) (explaining that "the defendant must show that the objection would likely have succeeded" when the defendant bases their ineffective assistance of counsel claim on defense counsel's failure to object). Thus, Harm's claim fails.

Third, Harm relatedly claims that he received ineffective assistance of counsel because his counsel failed "to zealously seek admission of text messages outside of [the] record proving [A.J.]

perjured her testimony" about discussing "sex and BDSM." SAG at 3. Harm claims that text messages outside the record show that A.J. agreed to BDSM and sexual activity. Because Harm's claim relies on documents outside of our record, the record is insufficient to consider it. *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008) (the court "cannot review" claims that rely on evidence outside the appellate record). Accordingly, we decline to review Harm's ineffective assistance of counsel claim.

B. EVIDENCE OF PURPORTED COCAINE USE

Separate from his claims related to ineffective assistance of counsel, Harm claims that the trial court erred by excluding evidence that A.J. was a cocaine user. Harm appears to assert that text messages outside of the record show that A.J. was a cocaine user.

As noted above, we review the trial court's decision to exclude evidence for an abuse of discretion. *Gunderson*, 181 Wn.2d at 922. Generally, under the rules of evidence, relevant evidence is admissible. ER 402. " 'Relevant evidence' " is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. But even relevant evidence can be excluded if its relevance is substantially outweighed by unfair prejudice. ER 403. Evidence is unfairly prejudicial when it is more likely to create an emotional response from a jury instead of a rational decision. *State v. Scherf,* 192 Wn.2d 350, 388, 429 P.3d 776 (2018).

Here, the trial court ruled that Harm could not elicit testimony from Morgan about cocaine use or whether A.J. said she was going to buy cocaine before the assault. The trial court determined the proposed testimony was prejudicial and not relevant because there was no evidence that A.J.

got or used cocaine before the incident. Harm's SAG claim offers nothing from our record to

show that the trial court abused its discretion with this determination. This claim fails.

CONCLUSION

We affirm Harm's conviction but remand for the trial court to strike the VPA.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040,

it is so ordered.

PRICE, J.

We concur:

MAXA, P.J.

LEE, J.